UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Terry Grant Gregory, | ) | Civil Action  No. 5:13-02008-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). Having carefully considered the parties' submissions and the applicable law, the court *affirms* the Commissioner's decision, as discussed herein.

I.   Relevant Background

A.   Procedural History

On October 4, 2009, Plaintiff filed applications for DIB and SSI alleging a disability onset date of December 8, 2008. Tr. 161-65.[1] After being denied both initially and on reconsideration, Tr. 69-72, 92-103, 108-109, on January 31, 2011, Plaintiff requested a hearing

---

[1] "Tr." is an abbreviation for "Transcript of the Record" made before the Social Security Administration in connection with Plaintiff's claim for DIB and SSI. It is located on this court's docket at ECF No. 16.

before an Administrative Law Judge ("ALJ"), Tr. 10-68. On August 23, 2011, the ALJ conducted a hearing, taking testimony from Plaintiff. Tr. 10-68. The ALJ issued a decision on October 25, 2011, denying Plaintiff's claims. Tr. 76-86. The Appeals Council subsequently denied Plaintiff's request for review, thereby making the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review. Tr. 1-7. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 22, 2013. ECF No. 1.

### B.  Plaintiff's Background

Plaintiff was born on April 13, 1967, and was 41 years old as of her alleged onset date of December 8, 2008. Tr. 18-21; 85. She completed high school and obtained an Emergency Medical Technician ("EMT") Certificate after completing an eight-month program. Tr. 17. Plaintiff worked as an EMT at Sumter Regional Hospital for nearly 20 years. Tr. 18-19. Additionally, Plaintiff worked for Stewart Emergency Medical from 2000 to 2003, and as a part-time sales associate with Belk for less than a year in 2000. Tr. 20-21. In 2007, Plaintiff was out of work on long term disability with her EMT job, but she returned to work after a tornado hit her town. Tr. 22.  Upon her return, Plaintiff worked in an office position and was able to make her own hours and lie down as needed. Later, a private company bought the hospital's ambulance service, and the new company terminated Plaintiff because she could not perform the normal work of an EMT or "couldn't get on the truck and do [her] duties." Tr. 22.

### C.  The Administrative Hearing

#### 1. Plaintiff's Testimony

Plaintiff and her counsel appeared at her administrative hearing on August 23, 2011. *See* Tr. 10-68. Plaintiff's alleged onset date was December 8, 2008, which was the last time she worked as an EMT. Tr. 18-21.

2

Plaintiff testified that she was 44 years old. Tr. 17. Plaintiff testified that she has a driver's license, but she has problems driving. *Id.* Specifically, Plaintiff testified that she can drive for 30 minute intervals but then has to stop driving due to pain in her back, hip, and knee. *Id.* Plaintiff is five feet three inches tall, and weighed 186 pounds at the time of the hearing. Tr. 18. She testified that she had been trying to lose weight to help with her back pain and had lost 18 pounds in the six months preceding the hearing. *Id.* However, she testified that there had been no difference in the pain since the weight loss. *Id.*

In her work as an EMT, Plaintiff would work in shifts, and two EMTs were assigned to a truck. Tr. 19. Plaintiff would have to lift half a gurney, and her shift co-worker would lift the other half. *Id.* The gurney alone weighed 75 pounds, and the average individual on the gurney weighed 200 pounds. Tr. 19-20. Accordingly, Plaintiff would bear approximately 135 pounds of weight when lifting a patient on a gurney. Tr. 20.

At the time of the hearing, Plaintiff's doctor was Melissa Vaughn, but Dr. Vaughn had referred Plaintiff to Dr. Ash. Tr. 22. Plaintiff testified that she is unable to work because she cannot stand or sit for long periods of time and often lies down for at least 30 minutes. Tr. 23. Additionally, Plaintiff puts a TENs unit on her lower back. *Id.* Plaintiff testified that she was also experiencing hip pain that travelled into her left leg and sometimes into her knee and foot. Tr. 24. She claimed to have sleep problems because she is unable to lie for long periods of time and can only sleep for three to four hours a night. Tr. 24, 43. Plaintiff testified that her back pain is constant and is a "burning, stabbing sensation." Tr. 25. Plaintiff testified that her hip pain was separate from her back pain and it hurts off and on but particularly hurts when it rains and when she is on her feet. *Id.*

Plaintiff testified that she is unable to walk her dogs on a leash and only walks outside with them in the yard. Tr. 25. She testified that she is only able to walk for five or ten minutes at a time. Tr. 28. She claimed to rarely shop anymore and only goes to the store for something simple—her husband does most of the shopping and house cleaning. *Id.* Plaintiff indicated she was able to perform "light duty" cleaning and was able to lift "[a]bout a gallon of milk." *Id.* Plaintiff testified that she is only able to sit in 20 minute intervals and avoids going out to dinner. Tr. 29. Plaintiff testified that she is able to wipe kitchen counters, do some light cooking, and wash some dishes. Tr. 37-38. She can work on tasks for 30 minute intervals. Tr. 38. Plaintiff can fold the laundry, but her husband has to sweep, mop, or clean the bathroom. Tr. 39. Prior to her injuries, Plaintiff testified that she would work overtime, travel, go camping, and ride horses. Tr. 39-40.

Plaintiff testified that she also has pain in her neck and hands, and sometimes her hands go numb or have a burning feeling. Tr. 30. She testified that her hands will go numb approximately twice a month for about an hour each time. *Id.* Plaintiff experiences neck pain five to six times monthly. Tr. 31. She describes her right knee pain as constant and indicated that the knee will lock up if she does not stand up or straighten it out. *Id.* Plaintiff testified that if she does not stop driving and move then her knee will lock up. *Id.*

Plaintiff takes ten to 16 milligrams of Vicodin and Lorcet four or five times daily for her pain. Tr. 32-33. Additionally, she takes Soma, a muscle relaxer, twice a day. Tr. 33. She testified that the Soma makes her sleepy and groggy, and Vicodin causes her to feel light-headed. Tr. 33-34. She claims she is disorganized and depressed all the time. Tr. 34. She also claims to have concentration problems. Tr. 35. Plaintiff is taking Prozac and Klonopin for depression, but she thinks her depression has not improved but has worsened since taking her medications. Tr. 36.

Plaintiff cannot pick up her four-year old granddaughter. Tr. 36. She claims she is emotional and does not get out much. Tr. 36-37. She testified that her condition has hurt her marriage. Tr. 37.

Plaintiff testified that she takes two different kinds of blood pressure pills. Tr. 41. Plaintiff testified that two or three times a week her blood pressure causes her to have a headache or feel flushed. Tr. 41. Plaintiff testified that she has flare-ups twice a month from ischemic colitis. Tr. 42. The flare-ups can last a couple days, and Plaintiff takes Bentyl, an anti-spasmodic medication, for the ischemic colitis. Tr. 42-43.

### 2. Vocational Expert Testimony

Vocational Expert ("VE"), Kristin Cicero, also testified at the administrative hearing. Tr. 51-66. The VE stated that Plaintiff's past relevant work ("PRW") was classified by the Dictionary of Occupational Titles ("DOT") as medium-skilled work, with an SVP [specific vocational preparation] of five. Tr. 55. The VE found that the PRW was generally performed at the very heavy exertional level because of the lifting that is involved, though the DOT defined the position as a medium exertional level. Tr. 55-56. Specifically, the VE testified that she had "worked with a lot of EMTs, and they all described the job as being very heavy." Tr. 55.

The ALJ posed a hypothetical question regarding an individual who was the same age as Plaintiff with the same education and work experience who "could perform light work as defined in the regulations, in that individual could frequently climb stairs, could occasionally climb ladders, could frequently balance and frequently stoop. The individual should only occasionally kneel, frequently crouch, and occasionally crawl." Tr. 56. The VE found that a person with such limitations would be unable to perform Plaintiff's PRW. Tr. 57. The ALJ then asked whether there were other jobs in the regional or national economy the person in hypothetical one could perform with no loud noise as an additional condition. Tr. 57.

The VE identified the following other jobs that would be available: (1) cashier; unskilled, light exertional level, SVP: 2; DOT number 211.462.010; 3.5 million jobs nationally and 57,000 positions in the state economy; (2) officer helper; light exertional level, unskilled, SVP: 2; DOT number 239.567-010; 1,200 positions in the state economy and approximately 93,000 positions nationally; and (3) ticket taker positions; unskilled, SVP: 2; generally performed at the light exertional level; DOT number 344.667-010; 1,200 positions in the state economy and in excess of 100,000 in the national economy. Tr. 57.  The VE opined that Plaintiff does not have directly transferrable skills and would need additional training. Tr. 58.

The ALJ posed a second hypothetical of a person of Plaintiff's "age, education, work experience limited to sedentary work, as sedentary is defined by the regulations. The same limitations as in applied in hypothetical one apply in hypothetical two." Tr. 58.  When asked if there were other jobs available, the VE identified the following positions: (1) lens inserter, sedentary, unskilled, SVP: 2, DOT number 713.687-026; 1,500 positions in the state economy and 45,000 jobs in the national economy, (2) order clerk, sedentary, unskilled, SVP: 2, DOT number 209.567-014; 1,600 jobs in the state economy and 220,000 jobs in the national economy, (3) visual inspector, sedentary, unskilled, SVP: 2, DOT number 669.687-014; 2,500 jobs in the state economy and 40,000 jobs in the national economy. Tr. 59-60. Under this same hypothetical with the same limitations, when asked if there would be jobs available if "the individual would be off-task one-third of the time," the VE responded "no." Tr. 60.

The VE answered affirmatively when Plaintiff's counsel asked whether the lens inserter position required "fine manipulation." Tr. 61. However, an order clerk would not require "fine manipulation" but would require use of a writing utensil. Tr. 61-62. Plaintiff's counsel posed a hypothetical question of whether an individual "who had some difficulty with gross

manipulation—dropping things, has some tingling, numbness in their right upper extremities, particularly on the right side where there has been a previous carpal tunnel release and the individual is right-hand dominant—how would that affect the ability to do those three jobs[]." Tr. 62-63. The VE responded that such an individual would not be able to maintain persistence and pace, and "would not be able to maintain employment. . .[but] it would depend on when the numbness was happening." Tr. 63. Further, the VE testified that if the numbness was happening at work and the individual essentially could not use her hands because of the numbness, "then that would absolutely preclude them from being able to maintain those jobs." *Id.*

Plaintiff's counsel posed another hypothetical:  "If the individual needed what's called a sit/stand option, where the individual would not be able to sit more than about 20 minutes at a time, could not stand or walk more than about 10 or 15 minutes at a time, how would that affect the jobs you listed in response to hypotheticals one or two?" Tr. 63-64. The VE responded that it would eliminate the cashier, office helper, and ticket taker positions but not eliminate the other sedentary jobs—it would just decrease them in number by about 50%. Tr. 64. Plaintiff's counsel also asked how any of the jobs the VE listed would be affected by an individual's difficulty with focus due to side effects from pain and side effects from medications such as grogginess and need of a 30 to 45 minute nap. Tr. 65. The VE responded that all jobs would be eliminated if the person needed to take a nap while at work. *Id.* Finally, the VE responded that an individual would be unable to perform any work if she had "difficulty consistently and independently persisting at and completing tasks in a timely manner due to her preoccupation with pain and her depression, prognosis guarded." Tr. 66.

II.  Discussion

A.  The ALJ's Findings

In her October 25, 2011 decision, the ALJ made the following findings of fact and conclusions of law:

1.    Claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2.    Claimant has not engaged in substantial gainful activity since December 8, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    Claimant has the following severe impairments: degenerative disc disease of the lumbar spine and headaches (20 CFR 404.1520(c)).

4.    Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with some additional limitations. Specifically, claimant can lift and carry up to 10 pounds occasionally and lesser amounts frequently. She can sit for 6 hours in an 8-hour day, and stand and walk occasionally. She can climb stairs frequently, but can climb ladders only occasionally. Claimant can balance, stoop, and crouch frequently but can kneel and crawl only occasionally. In addition, claimant must avoid loud noise.

6.    Claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    Claimant was born on April 13, 1967 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.    Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from December 8, 2008, through the date of this decision (20 CFR 404.1520(g)).

B.   Legal Framework

1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing past relevant work

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*,

("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

2.  The Court's Standard of Review

---

493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.   Analysis

Plaintiff argues that the ALJ erred by: (1) finding certain impairments to be non-severe rather than severe; (2) failing to consider the combined effects of Plaintiff's severe and non-severe impairments in assessing Plaintiff's residual functional capacity; and (3) asking defective

questions to the VE that did not include all of Plaintiff's impairments.  Pl's Br., ECF No. 21. The Commissioner contends that substantial evidence in the record supports the ALJ's decision on all three issues. Def. Br., ECF No. 23.

### 1.  Severe v. Non-Severe Impairments

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. § 404.1508. It is the claimant's burden to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff maintains that the ALJ discounted her impairments of osteoarthritis of the knees and hips, carpal tunnel syndrome, neck pain, hypertension, gastroesophageal reflux, and depression by finding them to be non-severe.  ECF No. 21 at 18. Additionally, Plaintiff maintains that the ALJ erred by ignoring Plaintiff's condition of obesity. *Id.* at 20-21. The court will consider each non-severe impairment and Plaintiff's obesity condition in turn.

### a.  Hip and Knee Osteoarthritis

Plaintiff alleges that the ALJ erred in failing to determine that Plaintiff's knee and hip impairments were not "severe." ECF No. 21 at 18-19. The Commissioner contends that

substantial evidence supports the ALJ's determination that Plaintiff's osteoarthritis in the hip and knees was a non-severe impairment. ECF No. 23 at 7-10.

In her finding that Plaintiff's hip and knee osteoarthritis were not severe, the ALJ reasoned:

> Paul Peach, M.D., assessed claimant with osteoarthritis of the bilateral knees and hips in July 2009. (Exhibit 3F) Dr. Peach's treatment notes and the other medical evidence of record, however, document few abnormal clinical findings with respect to claimant's knees or hips. Moreover, imaging studies during the time period at issue do not demonstrate significant findings and claimant has not required much treatment for these conditions.

Tr. 78. The ALJ does not cite to each reference of osteoarthritis or hip and knee pain from Plaintiff's medical records, but notes that "[Plaintiff's] medical records also document osteoarthritis of the knees and hips. . . ." *Id.* Furthermore, the ALJ notes that "[Plaintiff's] treating physicians have provided no opinions indicating permanent restrictions in excess of her assigned residual functional capacity." *Id.* at 84.

Plaintiff points to several instances where "pain," "palpitation," or "osteoarthritis" are noted in her medical records. ECF No. 21 at 18-19. However, whether Plaintiff suffers from osteoarthritis, knee pain, and hip pain, is not at issue. Rather, whether this condition is a severe impairment on Plaintiff's ability to work is at issue. *See Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (quotation omitted) (emphasis in original) (finding an impairment is not severe "only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."). Moreover, 20 C.F.R. § 404.1508 requires that the severity of the impairment be established by "medically acceptable clinical and laboratory diagnostic techniques" rather than only by a statement of symptoms. Here, the medical records presented to

the ALJ do not establish that this impairment affects Plaintiff's ability to work or, in other words, is "severe."

Regarding the effect of Plaintiff's impairment, one medical record noted a "mildly guarded gait secondary to pain." Tr. 537. Dr. Peach noted a stable physical examination in March of 2007 and in October of 2008. Tr. 393, 539. Dr. Peach found Plaintiff had a stable gait in August of 2007. Tr. 536. In March of 2011, Dr. Anderson,[3] observed a "normal gait and station," and "normal muscle strength, bulk, and tone." Tr. 261.  Additionally, Dr. Anderson opined that Plaintiff's "symptoms seem[ed] out of proportion to the findings on the MRI." Tr. 262. No medical reports indicate Plaintiff's condition severely impacts her ability to work, and no abnormal clinical findings are in the record.

Plaintiff's primary care physician ordered an x-ray of Plaintiff's left hip in July of 2011. Tr. 265. However, the results of the x-ray are not included in the record before the court. In October of 2011, Dr. Ezra Ash ordered an x-ray of the hip. Tr. 679. The results of the x-ray indicated that "[b]oth hip joint spaces are well maintained with no signs of a dislocation. There is no significant osteophyte formation and there are no abnormal soft tissue calcifications adjacent the hip," and the impression was "negative left hip series." Tr. 677. In another record, Dr. W.S. Edwards of the, Pee Dee Orthopedic Associates, noted on April 22, 2010, that Plaintiff planned to proceed with intervention concerning "significant issues" related to her right knee. Tr. 415. However, the record contains no indication of an intervention plan or ongoing treatment. Tr. 78. Plaintiff was able to squat to approximately 40 degrees of knee flexion in a May 2010 Comprehensive Orthopedic Examination. Tr. 424. At the examination, Plaintiff complained of hip pain, but there were no radiographs of the hips available for review. Tr. 425.

---

[3] Dr. Thomas S. Anderson of Grand Strand Surgical Specialists, LLC, examined Plaintiff on March 8, 2011, for complaints of lower back pain. Tr. 261-62.

The court notes the absence of objective medical evidence demonstrating severity and notes the medical evidence reviewed by the ALJ indicating that Plaintiff's osteoporosis will not interfere with Plaintiff's ability to work in a sedentary job. Accordingly, the ALJ's finding, that Plaintiff's hip and knee osteoarthritis is not a severe impairment, is supported by substantial evidence in the record as discussed above.

b. Bilateral Carpal Tunnel Syndrome, Neck Pain, and Burning Paresthesias in the Upper Extremities

Plaintiff maintains that the Commissioner minimized her reports to doctors of burning and numbness in her upper extremities, pointing to the specific parts of the report. ECF No. 21 at 19.

In addressing Plaintiff's carpal tunnel impairment, the ALJ found: "December 2008 treatment notes report that nerve conduction studies showed bilateral carpal tunnel syndrome. In December 2008, Plaintiff underwent right-sided carpal tunnel release surgery. (Exhibit1K)." Tr. 79. However, the ALJ noted that since 2008, Plaintiff had not required much, if any, additional treatment for this condition. *Id.* Additionally, the ALJ noted that in December 2010, Plaintiff complained of "neck pain with burning paresthesias in the bilateral upper extremities for the last 3 or 4 months. (Exhibit 25F)[.]" *Id.* However, the ALJ found that Plaintiff "did not often report having neck pain or symptoms in her upper extremities to her treating physicians." *Id.* Rather, the ALJ noted that in May 2010, "orthopedic consultative examiner, Regina Roman, D.O., documented that Plaintiff had full range of motion in her neck, elbows, and wrists [and Plaintiff] was able to perform fine dexterity movements in her fingers and to rapidly alternate motion with her hands. (Exhibit 7F)[.]" *Id.*

Concerning Plaintiff's upper extremities, the ALJ pointed to Dr. Wallisa Vaughn's medical notes that indicated Plaintiff had "equal and full strength in her upper extremities.

(Exhibit 17F)[.]" *Id.* Similarly, Plaintiff's neurosurgeon, Dr. Thomas Anderson, noted 5/5 strength in the upper extremities in March 2011. *Id.* Additionally, the ALJ remarked on a cervical MRI from February 2011 showed only mild central disc protrusion at C5-6 and was otherwise negative. *Id.* (citing Exhibit 28F). Finally the ALJ found that Plaintiff has not required any significant treatment for neck pain during the time period at issue and has not required much treatment for upper extremity symptoms other than her carpal tunnel release surgery. *Id.*

In support of her assertion that the ALJ minimized the above impairments, Plaintiff cites to three pieces of evidence. ECF No. 21 at 19. First, she cites Dr. Roman's May 2010 consultative examination. Tr. 420-26. Dr. Roman noted Plaintiff's carpal tunnel syndrome as well as Plaintiff's right carpal tunnel release, and found that Plaintiff has "a well-healed right carpal tunnel cicatrix."[4] Tr. 423-24. Dr. Roman's report contains no reference to burning or numbness in Plaintiff's upper extremities. Tr. 420-26. Specifically, Dr. Roman found: "There were no joint deformities, edema, or tenderness of the hands or fingers. She had full range of motion of all fingers. She was able to manipulate buttons, coins, and larger objects with both hands." Tr. 425. Finally, Dr. Roman noted that Plaintiff's muscle strength was "5+/5 and symmetrical in the upper and lower extremities [and] [f]ine dexterity movements of the fingers and rapid alternating motions of the hands were intact." Tr. 425.

Additionally, Plaintiff cites to medical progress notes from Physician's Assistant, Patricia Mathias, of the MUSC Neurosurgery Clinic. Tr. 654. In a letter to Dr. Jessica Manaker dated December 10, 2010, Mathias indicates that Plaintiff reported

> burning paresthesias of the bilateral upper extremities over the previous 3-4 months with increased frequency in the last 2 months. The symptoms begin in all 10 digits and radiate up her arms. The symptoms are worse on the left side than the right. They are aggravated by holding the telephone in her hand. She does endorse that she drops things due to the fact that she cannot feel them in her hand.

---

[4] Cicatrix is scar tissue.

> However, she denies any problems with opening jars or any dexterity issues. Occasionally her arms do awaken her during sleep.

Tr. 654. In her notes on Plaintiff's physical examination, Mathias indicates that "she has 4+/5 grip. Her left EHL is 4+/5. The rest of her upper and lower extremity motor exam is 5/5 at all major muscle groups bilaterally." Tr. 655. Finally, Plaintiff cites to an October 19, 2011 medical note of Dr. Ash that indicates Plaintiff has bilateral tingling in her hands. Tr. 679.

Plaintiff, without elaboration or explanation, references only three places in the record where these impairments are discussed. Moreover, the ALJ noted these impairments but found Plaintiff had not sought treatment for them and also found that Plaintiff's dexterity was not limited by them. Tr. 79. Regarding these impairments, the court again notes the absence of objective medical evidence demonstrating severity and notes the medical evidence reviewed by the ALJ indicating that Plaintiff's impairments will not interfere with Plaintiff's ability to work in a sedentary job. Accordingly, the ALJ's finding, that Plaintiff's bilateral carpal tunnel syndrome, neck pain, and burning paresthesias in the upper extremities are not severe impairments, is supported by substantial evidence in the record as discussed above.

### c. Depression

Plaintiff maintains that the ALJ attempts to ignore a consultative examination with Dr. Charles Jackson concerning her depression. ECF No. 21 at 19. The Commissioner argues that the ALJ's decision is supported by substantial evidence in the record and that the ALJ is responsible for making credibility determinations and resolving conflicting evidence. ECF No. 23 at 13.

The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate

the presence of a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C. The ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." *Id.* § 404.1520a(c)(2); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C–H. The ratings for the first three functional areas-activities of daily living; social functioning; and concentration, persistence, or pace-consist of a five-point scale: none, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). The fourth functional area-episodes of decompensation-uses a four-point scale: none, one or two, three, and four or more. *Id.*

In her decision, the ALJ acknowledged and discussed Dr. Jackson's examination but noted that Plaintiff told him her depression was related to pain and pain medication. Tr. 79. The ALJ noted that Plaintiff told Dr. Jackson she suffered from symptoms of depression such as crying spells and feelings of worthlessness. *Id.* However, the ALJ found that Plaintiff's other treating physicians did not regularly report these symptoms, and Plaintiff never received treatment from mental health professionals or inpatient hospitalization for depression. *Id.* Additionally, Plaintiff's treating physicians had prescribed her Cymbalta, Paxil, and Xanax, and medication management appeared to have been working. *Id.*

Furthermore, the ALJ found that Dr. Jackson's report had inconsistent findings. *Id.* Specifically, the ALJ noted that Dr. Jackson found that Plaintiff had difficulty consistently and independently completing tasks in a timely manner due to her preoccupation with pain and depression, however, Dr. Jackson also found that Plaintiff's long-term and short-term memory were intact. *Id.* Additionally, Dr. Jackson noted that Plaintiff was alert and had an adequate grasp of general knowledge and estimated normal intelligence. *Id.* Dr. Jackson noted that Plaintiff's associations were logical, her reality assessment was within normal limits, and Plaintiff was oriented to time, place, person, and situation. Tr. 79-80.

After consideration of the evidence, the ALJ found that Plaintiff's "medically determinable mental impairment of depression does not cause more than minimal limitation[s] in her ability to ability to perform basic mental work activities and is, therefore, non-severe." Tr. 80. As required by the regulations, in her decision the ALJ documented application of the proper technique by incorporating pertinent findings and conclusions as to the degree of limitation in each of the functional areas. Tr. 80. The ALJ noted that Plaintiff's mental impairment "causes no more than 'mild' limitation[s] in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area. . . ." Tr. 80.

Upon review of the record, the court finds that the ALJ's conclusion is supported by substantial evidence. The ALJ considered the evidence and Plaintiff's testimony in her functional assessment. "Simply because the plaintiff can produce conflicting evidence which might have resulted in a contrary interpretation is of no moment." *Washington v. Astrue,* 659 F. Supp. 2d 738, 753 (D.S.C. 2009) (referencing *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972)). *See generally Jackson v. Astrue,* No. 8:08–cv-2855–JFA-BHH, 2010 WL 500449, at *10 (D.S.C. Feb. 5, 2010) ("[A]n ALJ is not required to provide a written evaluation of every piece of

evidence, but need only minimally articulate his reasoning so as to make a bridge between the evidence and its conclusions.") (internal quotation and citations omitted). Accordingly, the undersigned finds Plaintiff's argument on this point is without merit because the ALJ performed the special technique for assessing the severity of a claimant's mental impairments and adequately documented her evaluation of Plaintiff's mental impairments.

### d. Obesity

Plaintiff argues that the ALJ erred in failing to consider Plaintiff's obesity. ECF No. 21 at 20. Though Plaintiff weighed 186 pounds at her hearing, Plaintiff's weight was higher from 2008-2011, and some of her medical notes indicate "obesity" or "morbid obesity." *Id.* Plaintiff maintains that the ALJ failed to comply with SSR 02-01p in not considering the impact of Plaintiff's obesity on her ability to work. *Id.*

> SSR 02-1p provides:
>
> We may also find that obesity, by itself, is medically equivalent to a listed impairment (or, in the case of a child applying under title XVI, also functionally equivalent to the listings). For example, if the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence. . . .
>
> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching. The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers. The ability to tolerate extreme heat, humidity, or hazards may also be affected. . . .
>
> Individuals with obesity may have problems with the ability to sustain a function over time. . . . In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.

In essence, SSR 02-1p provides that the ALJ can determine that an individual is disabled based on the effect of her obesity, not simply the presence of obesity alone. *See Backman v. Colvin*, No. 4:12-cv-1897-TER, 2014 WL 798356, at *5 (D.S.C. Feb. 27, 2014) (citing SSR 02–1p, 67 Fed. Reg. 57859–02 (Sept. 12, 2002)).

Initially, the court notes that Plaintiff does not assert that her Body Mass Index ("BMI") falls into one of the three recognized levels of obesity outlined in SSR 01-2p. Rather, Plaintiff relies mainly on medical records that categorize her as "obese."  However, at the time of the hearing before the ALJ, no medical provider or nutritionist opined that Plaintiff was clinically obese based on Plaintiff's weight of 186 pounds. Additionally, though Plaintiff testified about her success in losing weight at the instruction of her medical providers, she did not indicate that her weight was restricting her in any way or indicate that her weight was an impairment.  Tr. 18. In fact, "obesity" was never mentioned during Plaintiff's hearing. Moreover, Plaintiff testified that there had been no difference in her pain since her 18 pound weight loss in the six months preceding the hearing. Tr. 18.

The ALJ's failure to specifically address Plaintiff's obesity is harmless based on Plaintiff's failure to present evidence demonstrating how her obesity has impacted her ability to work. *See, e.g., Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994) (affirming the ALJ's decision where he would have undoubtedly reached the same "reached the same result notwithstanding his initial error"); *Elder v. Astrue*, No. 3:09-02356-JRM, 2010 WL 3980105, *9 (D.S.C. Oct. 8, 2010) ("As neither her medical records, nor her own statements, provide such evidence as to her obesity, any failure of the ALJ to explicitly address Plaintiff's obesity is only harmless error."); *Owen v. Astrue,* 551 F.3d 792, 801 (8th Cir. 2008) (refusing to set aside an administrative finding when it had no effect on the outcome). Moreover, the duty to evaluate a

Plaintiff's symptoms under 20 C.F.R. § 404.1529(c), "does not extend to guessing the impact of a condition." *Elder* at \*9. Accordingly, the ALJ's failure to specifically address Plaintiff's obesity is harmless.

### 2. Combined Effects of Plaintiff's Impairments

Plaintiff's second main allegation of error is the ALJ failed to adequately consider the combined effects of Plaintiff's severe and non-severe impairments. ECF No. 21 at 18, 22. Specifically, Plaintiff alleges that the ALJ failed to comply with SSR 96-3p when assessing the severity of Plaintiff's osteoarthritis, carpal tunnel syndrome, neck pain, and depression because the medical evidence establishes that these impairments are more than "slight abnormalities." ECF No. 21 at 22. The Commissioner asserts the ALJ properly considered all of Plaintiff's medically determinable impairments, both severe and non-severe, which satisfies the regulation requirement that both be considered together. ECF No. 23 at 7.

When a plaintiff has more than one impairment, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of these impairments in determining the claimant's disability status. *See Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir. 1989); *Lemacks v. Astrue*, No. 8:07–2438–RBH–BHH, 2008 WL 2510087, \*3 (D.S.C. May 29, 2008). Even if the plaintiff's impairment or impairments in and of themselves are not "listed impairments" that are considered disabling per se, the Commissioner must also "consider the *combined effect* of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B) (2004) (emphasis added). The ALJ must "consider the combined effect of a claimant's impairments and not fragmentize them." *Walker,* 889 F.2d at

50. "As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Id.*

Here, the ALJ considered the combined effects of all of Plaintiff's impairments and determined that "the findings related to them are not at least equal in severity to those described in Listings 1.02, 1.04, 4.00H, and 12.04." Tr. 81. Specifically, the ALJ "considered the cumulative effects of the impairments on [Plaintiff's] ability to work." *Id.* In her analysis, the ALJ noted that evidence demonstrates: (1) Plaintiff can ambulate effectively; (2) she exhibits a normal gait as reported by examining physicians; (3) Plaintiff does not use an assistive device as documented by a consultative examiner; (4) Plaintiff can walk the length of one or one and a half blocks; (5) Plaintiff can bathe and dress herself; and (6) Plaintiff performs mild household chores with the assistance of her husband. Tr. 81.

As reviewed, the ALJ thoroughly addressed each of Plaintiff's impairments, both severe and non-severe, in steps two and three of the analysis. Tr. 78-81. However, most of the ALJ's analysis of the record evidence regarding the combination of Plaintiff's impairments is contained in the portion of the decision specifically addressing Plaintiff's residual functional capacity. In the fifth step of the analysis, the ALJ again examines each of Plaintiff's impairments, the symptoms from the impairments, and the limiting effects of the impairments in making her determination that Plaintiff can perform sedentary work and was not completely disabled. Tr. 81-85. Moreover, the ALJ afforded "little weight to the opinions of the state agency medical consultants at exhibits 9F and 14F indicating that [Plaintiff] can perform light work because the overall evidence of the record supports a finding that [Plaintiff] should be limited to sedentary work with additional limitations." Tr. 84. It is noted that this court has found other ALJs' discussions of the effect of a claimant's combination of impairments sufficient in prior cases

where the ALJs' discussions of a claimant's combination of impairments were no more explicit or detailed than that of the ALJ in this case. *See, e.g.*, *Thornesberry v. Astrue*, No. 4:08-4075-HMH-TER, 2010 WL 146483, at *5 (D.S.C. Jan. 12, 2010); *Ingram v. Astrue*, No. 3:07-cv-823, 2008 WL 3823859, at *2 (D.S.C. Aug. 12, 2008).

Following review, the undersigned finds that the ALJ's finding that Plaintiff can perform sedentary work, even in light of the combined effects of Plaintiff's impairments, is sufficiently detailed and explanatory, especially when examining the decision in its entirety. Accordingly, Plaintiff's argument to the contrary is without merit because the ALJ's determination is supported by substantial evidence in the record.

### 3. Step Five and Questions to VE

Plaintiff argues that the ALJ failed to meet her burden at Step Five of the Sequential Evaluation Process. ECF No. 21 at 23. Specifically, Plaintiff maintains that though the ALJ properly sought the opinion of the VE, the hypothetical question posed to her was defective because it did not include all of Plaintiff's impairments. *Id.* at 22-23. Thus, Plaintiff contends that the VE's responses to the ALJ's questions were defective. *Id.* at 23. Rather, Plaintiff asserts that the VE's response to Plaintiff's counsel's questions—that there were no jobs that Plaintiff could perform on a continued and sustained basis—accurately reflected all of Plaintiff's impairments. *Id.* The Commissioner argues that the hypothetical question the ALJ posed to the VE was proper because the ALJ considered all of Plaintiff's impairments in her decision. ECF No. 23 at 16. Therefore, the Commissioner maintains that the VE's testimony supports the ALJ's finding at step 5 of the sequential evaluation process. *Id.*

"In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record." *Walker v. Bowen*, 889 F.2d at 50; *see*

*also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993) ("In questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record of the claimant's impairment."). However, the hypothetical question need only include all of the claimant's credible impairments. *See Johnson v. Barnhart*, 434 F.3d at 659; *see also Walker v. Bowen*, 889 F.2d at 50 (noting that a vocational expert's opinion can only be helpful if it is "in response to proper hypothetical questions which fairly set out all of claimant's impairments"). Accordingly, if the record does not support the existence of a limitation, the ALJ need not include it in the hypothetical question. As noted above, there is substantial evidence supporting the ALJ's conclusion that Plaintiff's symptoms would not prevent her from performing sedentary work. As such, the court finds that the ALJ's hypothetical question to the VE adequately and accurately reflected Plaintiff's conditions.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

July 29, 2014                                          Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge